**Affirmed and Memorandum Opinion filed August 6, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00324-CR

---

### KENNETH RAY JONES, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

### On Appeal from the 178th District Court
### Harris County, Texas
### Trial Court Cause No. 1249914

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant, Kenneth Ray Jones, guilty of aggravated robbery and assessed his punishment at twenty-five years' incarceration. In two issues on appeal, appellant contends that (1) the video lineup was unduly suggestive, thereby tainting any in-court identification; and (2) the instruction to disregard the State's comment, during the punishment phase of trial, on appellant's failure to testify was insufficient to cure the harm. We affirm.

# I. BACKGROUND

## A. Guilt-Innocence Phase of Trial

Around 12:30 p.m., on January 10, 2010, Nicholas Oupraxay took trash from his apartment to the dumpster at the complex where he resided. Nicholas was also carrying his wallet, the key to his pickup truck, and an envelope with his address on it. On the way back from the dumpster, Nicholas saw two men sitting outside by the building, waved to them, and said good morning. The two men—one short and the other tall—then walked toward Nicholas, who thought, "[I]t's not normal. Looked like I was going to get robbed."

The short man, who was later identified as appellant, told Nicholas to stop and pointed "a machine gun or rifle" at him. The tall man, who was later identified as Christian Austin, had a pistol and put it to Nicholas's neck. Appellant took Nicholas's wallet and keys and ordered Nicholas to raise his hands and lie on the ground. Nicholas was wearing shorts, a T-shirt and a hooded jacket because he was going to the gym. When he was on the ground, the men told Nicholas to take off his shorts, and they checked to make sure he did not have anything else on him. The men then ordered Nicholas to get up.

When appellant asked Nicholas where he lived, Nicholas stated that he did not live there. Appellant, however, took from Nicholas the envelope, which had Nicholas's address showing that he lived in the apartment complex. At appellant's instruction, Nicholas led them to the apartment where he lived with his brother, Richard Oupraxay. They heard someone upstairs, and Nicholas said that was his brother. Appellant told Austin to go upstairs and get Richard. Appellant and Nicholas stayed downstairs in the living room, sitting on couches opposite each other with appellant pointing a gun at Nicholas. Nicholas was alone with appellant for about twenty-five minutes.

Richard was using the restroom upstairs when Austin came in the bathroom with a gun and ordered Richard to go downstairs. Richard, who had been asleep shortly before, had not heard anything before that, and he did not know where Nicholas was.

Austin brought Richard downstairs to the living room, and sat him next to Nicholas. Appellant told Richard five times that he was going to kill him. Austin went back upstairs, while appellant, Nicholas, and Richard remained downstairs. Austin came back downstairs, and the four of them eventually went upstairs where appellant and Austin, using masking tape, tied up Nicholas and Richard, who were sitting on the floor back to back. Appellant and Austin told Nicholas and Richard not to move until after they had left. Nicholas could hear somebody moving around downstairs. Richard was able to free himself of the masking tape, and then he released Nicholas. Nicholas used a phone he had hidden under his bed to call the police. Appellant and Austin had taken a big screen TV, a guitar, a laptop computer, money, gold, and Nicholas's Toyota Tacoma pickup truck.

Officer Andres Miller of the Houston Police Department responded to the scene of the robbery. The description of appellant provided to Miller was that of "a black male, 18 to 25 years of age, five-four to five-foot-seven in height 160 to 170 pounds, black afro, short hair, wearing long-sleeve red shirt with oversized blue jeans . . . [and] gold upper teeth." Miller was not able to locate any latent prints to lift, and he did not take any photographs of the crime scene. There were no other witnesses to the crime.

On January 13, 2010, Nicholas and Richard viewed a live lineup at the police station, but neither one was able to indentify anyone from that lineup. Appellant was arrested in another aggravated robbery case. On January 26, 2010, Officer David De Torres took a video statement from appellant, in which appellant

3

admitted to driving Nicholas's pickup truck. On January 27, 2010, Nicholas and Richard separately viewed the video of a lineup that originally took place on November 22, 2009, in another case. The November 22, 2009 lineup included both appellant and Austin. Nicholas and Richard identified appellant and Austin in the video lineup. On January 28, 2010, De Torres obtained and executed a search warrant for an apartment leased to appellant. De Torres recovered a number of items stolen from Nicholas and Richard. Appellant was charged with aggravated robbery. Appellant pleaded not guilty, and the case was tried to a jury.

Appellant filed a motion to suppress in-court identification arguing that, because the pretrial identification procedure was impermissibly suggestive, the in-court identifications would be tainted. As described in greater detail below in our discussion of appellant's first issue, the trial court held two hearings on appellant's motion to suppress in-court identification of him—one hearing as to Nicholas's identification of appellant and another hearing as to Richard's identification of appellant. The trial court denied appellant's motion as to both Nicholas and Richard. In front of the jury, Nicholas and Richard identified appellant.[1] The jury found appellant guilty of aggravated robbery.

### B. Punishment Phase of Trial

The State and appellant presented evidence at the punishment phase of the trial. At the beginning of the punishment phase, appellant stipulated to a prior felony charge of burglary of a habitation and a prior misdemeanor conviction for criminal trespass for which he had received 180 days in Harris County jail.

Nicholas and Richard testified about how the robbery affected them. Nicholas and Richard moved elsewhere within two or three days after the robbery.

---

[1] The trial court also held a hearing on appellant's motion to suppress oral statements, which the trial court denied. Appellant does not complain of that ruling in this appeal.

4

Nicholas testified that after the robbery he could not sleep, he felt unsafe, and he stayed home a lot. At one point, Richard and Nicholas were not living together, but Richard came back to live with Nicholas because Nicholas did not want to be by himself. Richard was angry about the robbery, and some of the things stolen were valuable to him.

The State presented evidence that appellant was involved in another aggravated robbery on December 20, 2009. Around 2:00 a.m., on December 20, 2009, Justo Ramirez was returning home from his job in the bakery at the Houstonian. As Ramirez walked to his apartment, a man, with a gun pointed at him, told him to lie on the ground and asked for his cell phone and wallet. The man, who was about five-foot eight and was later identified as Austin, asked for the pin number on Ramirez's credit card, but Ramirez did not know the number because he only used the card for emergencies, and stated to appellant: "if you want, I'll take you to Walmart and you can spend the entire balance in the card."

Once inside the apartment, Austin called another man, who was shorter and was later identified as appellant. Austin made Ramirez sit on the couch, while appellant started taking things from the apartment. Austin told Ramirez not to leave the apartment for ten to twelve minutes. After they had left, Ramirez locked the door, and then he "opened the door like scared" and called the police from his neighbors' phone. On February 1, 2010, Ramirez identified Austin and appellant from the November 22, 2009 video lineup. Ramirez identified appellant in front of the jury, and stated that he "couldn't make a mistake. I recognized [appellant] very well." Ramirez testified that he felt unsafe, and moved out of his apartment. Ramirez stated, "[N]ow every time you come home late, you feel unsafe, and this will remain forever."

5

The State further presented evidence that appellant was involved in another aggravated robbery on December 31, 2009. At 3:30 p.m., on December 31, 2009, Bonnie Figueroa and her seven-year-old daughter, Adalee, were walking from their apartment to their car when two males with guns, later identified as appellant and Austin, stopped them. When Figueroa told them to just take her purse, appellant told her to shut up or he was going to shoot. Appellant pointed the gun at Figueroa and her daughter. They stole her phone, money, and gift cards. After that, Austin took off running, and appellant "stayed holding the gun kind of towards my daughter's head and backed away slowly and kept telling us not to say anything or he would be back." Figueroa and her daughter drove to her husband's place of work and subsequently called the police from her mother's house.

On January 21, 2010, Figueroa identified appellant and Austin in the November 22, 2009 video lineup. Figueroa had "panic attacks for a long time" and could not leave work or her apartment on her own. Figueroa moved from that apartment because she "couldn't stay there anymore." Her daughter gets scared if they have to walk anywhere by themselves and will no longer sleep alone. "When it's nighttime, [her daughter] puts the chair in front of the door. She's scared somebody could come in." Adalee testified that, after the perpetrators left, she thought "they would come back and kill us," and had "bad nightmares about them coming back." At the time of trial, Adalee was still scared.

The jury also heard evidence of another crime involving appellant. After 11:30 p.m., on January 19, 2010, Juan Ernesto Guerrero and his parents, Juan Guerrero Patino and Clemencia Guerrero, were walking from their cars to their apartment, when two men pointing guns at them told them to lie on the ground. The men asked the Guerreros if they lived there and told the Guerreros to take them to their apartment. When they got to the apartment, the men told the

Guerreros to lie on the ground. The men asked if anyone was inside. Juan Ernesto lied and said no, even though his younger sister, brother, and nephew were there. One of the men took the keys from Juan Ernesto, but could not open the door. Then one of the men shot Juan Ernesto in the head, and he was treated at the hospital. One of the suspects was taller than the other, but Juan Ernesto did not get a good look at the shorter one, and he was unable to identify anyone in the November 22, 2009 video lineup.

Although Clemencia first told the officer in March 2010 that she could not identify anyone in the lineup, she testified that she was able to identify appellant in the video lineup, and she identified him in court. Clemencia stated that appellant's "mouth was large, like thick . . . [and] he had gold teeth." Juan Guerrero Patino identified appellant in the video lineup and identified him in court, but he could not say which one of the men shot his son.

Appellant presented the testimony of his uncle, Larry Jones. Jones testified that he knew appellant "very well," but he did not know that appellant was in a gang, and he was surprised that appellant was involved in these crimes. Jones described appellant as a "straight-A student." According to Jones, appellant's father was not a part of his life when was growing up, and Jones tried to "step in to a certain point."

Appellant's mother, Yvonne Jarmin, described appellant as an honor roll student, but he dropped out of school after the eleventh grade. Appellant had obtained his GED since he had been incarcerated. Appellant had never been previously convicted of a felony, although he had been convicted of a Class A misdemeanor and spent 180 days in jail. When appellant was younger, he helped Jarmin with chores and followed her rules. Appellant's father was not in his life at all when he was younger. Jarmin heard that appellant's father "was supposed to

7

have been locked up." Jarmin did not know that appellant had been telling people he was in a gang. Appellant had worked at McDonald's for about three months and a car wash for about two-and-one-half months, but did not have a job when he was arrested. Jarmin did not know how appellant had the money to rent an apartment or drive a BMW. She picked up appellant's property from jail, which included gold teeth.

The jury assessed appellant's punishment at twenty-five years' incarceration.

## II. PRETRIAL IDENTIFICATION

In his first issue, appellant complains that the video lineup was unduly suggestive because it did not include other men of similar appearance to appellant, it included his co-defendant, and the complainants admitted that viewing the video lineup aided them in their in-court identification of appellant. Appellant, therefore, claims that, absent the lineup and identification, the evidence is legally and factually insufficient to support appellant's conviction.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Adams v. State*, 397 S.W.3d 760, 763 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008)). The appellate court views the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). We review the trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). At the suppression hearing, the trial court is the sole finder of fact and judge of the credibility of the witnesses and the weight given their testimony. *Wiede*, 214 S.W.3d at 24. We give almost total deference to the trial court's

determination of historical facts that depend on credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We review de novo questions of mixed law and fact that do not turn on an evaluation of credibility and demeanor. *Id.* Whether a pretrial identification procedure was impermissibly suggestive so as to create a substantial likelihood for misidentification is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor. *Loserth v. State*, 963 S.W.2d 770, 772–73 (Tex. Crim. App. 1998). We will sustain the trial court's ruling admitting the evidence if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process. *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). Courts employ a two-step analysis in determine the admissibility of an in-court identification: (1) whether the out-of-court identification procedure was impermissibly suggestive; and (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Id.* at 33. It is the appellant's burden to prove the in-court identification is unreliable by establishing both elements by clear and convincing evidence. *Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

To warrant the exclusion of the in-court identification, the appellant must show that the lineup identification procedure was impermissibly suggestive. *Rojas v. State*, 171 S.W.3d 442, 448 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). "A pretrial procedure may be suggestive, but that does not necessarily mean it is impermissibly so." *Id.* "In the absence of impermissibly suggestive pretrial procedures, in-court identification testimony is always admissible." *Cooks v.*

*State*, 844 S.W.2d 697, 732 (Tex. Crim. App. 1992).

Suggestiveness may be created by the manner in which the pretrial identification procedure is conducted, for example, by police pointing out the suspect or suggesting that a suspect is included in the lineup. *Barley*, 906 S.W.2d at 33. A lineup may also be considered unduly suggestive if other participants are greatly dissimilar in appearance from the suspect. *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd.). Thus, a lineup is suggestive when the suspect is placed with persons of distinctly different appearance, race, hair color, height, or age. *Id.* Minor discrepancies between lineup participants will not render a lineup impermissibly suggestive. *Brown v. State*, 29 S.W.3d 251, 254 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Although the better practice may be to get as many individuals as possible who fit the suspect's description, it is not essential that all individuals be identical in appearance. *Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985). "[N]either due process nor common sense require such exactitude." *Id.* (internal quotations and citation omitted).

If we conclude that the procedure was impermissibly suggestive, we then determine whether the impermissibly suggestive nature of the pretrial lineup gave rise to a substantial likelihood of irreparable identification. *Adams*, 397 S.W.3d at 764. In doing so, we consider the following factors: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the time of confrontation; and (5) the length of time between the offense and the confrontation. *Rogers v. State*, No. 14-12-00182-CR, — S.W.3d —, 2013 WL 2442194, at *6 (Tex. App.—Houston [14th Dist.] June 6, 2013, no pet. h.) (citing *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App.

2008)). When examining these factors, the crux of the focus is on reliability. *Id.* "Reliability is the linchpin in determining the admissibility of identification testimony." *Luna*, 268 S.W.3d at 605. "The identification testimony will be admissible if the indicia of reliability outweigh the apparent corrupting effect of the unnecessarily suggestive pretrial occurrence." *Harris v. State*, 827 S.W.2d 949, 959 (Tex. Crim. App. 1992).

## B. Suppression Hearings

Prior to the presentation of the parties' opening statements, the trial court stated that it would hold a hearing on appellant's motion to suppress the in-court identification of appellant when the issue arose. During Nicholas's testimony, one of the prosecutors informed the trial court at the bench that she was planning to ask Nicholas for an in-court identification of appellant. At that point, the trial court held a suppression hearing out of the presence of jury. At the conclusion of the hearing, the trial court denied the motion to suppress in-court identification as to Nicholas. Nicholas resumed his testimony and made an in-court identification of appellant. Later, during Richard's testimony, the other prosecutor informed the trial court that she planned to bring up the identification issue. The trial court held another hearing as to Richard and denied appellant's motion as to Richard and, again, as to Nicholas. Richard similarly identified appellant in front of the jury.

The evidence at the first suppression hearing showed that De Torres conducted a live lineup on January 13, 2010. Neither appellant nor Austin was in that lineup, and neither Nicholas nor Richard picked anyone out of the live lineup.

In the course of investigating this case, De Torres found out about a November 22, 2009 lineup with Austin in it. Sergeant Darrell DeFee and Sergeant H.R. Mar conducted the November 22 lineup in a different robbery case. Both Austin and appellant, who were suspects in the other robbery case, were in the

11

November 22, 2009 lineup. So, on January 27, 2010, De Torres conducted a second lineup in this case. He asked Nicholas and Richard to view the video of the November 22, 2009 lineup. De Torres did not know appellant was a suspect in this case until Nicholas and Richard picked him, along with Austin, out of the November 22, 2009 lineup.

Both officers who participated in the November 22, 2009 lineup testified. DeFee, who chose the individuals to participate, testified about his process for putting together the lineup. DeFee stated that there were other individuals in the lineup that had the same skin tone and similar characteristics as appellant. DeFee explained that height is one of the primary factors in putting together a lineup. Three of the other participants in the lineup were five-seven, five-eight, and five-nine. The other primary factors are gender, ethnicity, and weight. Secondary factors are facial hair, scars, tattoos, piercings, and gold dental work.

DeFee testified that there was no one else the exact same height as appellant. He placed Austin and appellant in the same lineup, even though they were suspects in the same investigation, because they were similar in size and appearance. With respect to his decision to place appellant and Austin in the same lineup, DeFee further explained: "It's a matter of practical procedural matters to put them both in the same lineup since we're limited to the number of fill-in subjects that would be available to us in the jail population." DeFee disagreed that, in a "perfect world," the "better practice" would be to have a separate lineup for each suspect. He also did not agree that the "better practice [would] be to have five short people in the lineup just like Mr. Jones. . . . I've never done a perfect world lineup. It's a real practical world out there."

Mar also testified about the November 22, 2009 lineup. Although he assisted DeFee with the lineup, Mar did not have any input in the selection of the

participants in the lineup. Mar acknowledged that appellant was the shortest person in the lineup but explained that "you're not going to find too many people who's five foot two." Four of the other participants were five-four, five-seven, five-eight, and five-nine. Mar explained that the lineup participants were from the smaller population of the city jail rather than the county jail. According to Mar, DeFee could not do a lineup at the county jail because appellant and Austin were under investigation but not charged.

De Torres also testified about his use of the November 22, 2009 lineup in this case. De Torres agreed that one suspect in this case was tall (Austin), while the other was short (appellant). Therefore, "[i]deally," there should have been one lineup for Austin with tall individuals and one lineup for appellant with short individuals. De Torres, however, explained that the composition of the lineup depends on the availability of the individuals incarcerated in the city jail at the time of the lineup. De Torres pointed out that the lineup included individuals of different heights. Moreover, all six participants were all males between the ages of seventeen and twenty-two, of the same race or ethnicity, and same build and size. Appellant, who weighed 130 pounds, was not the smallest in terms of weight. De Torres thought it was "a fair lineup" and was not concerned about the presence of both suspects in the lineup.

De Torres showed the video lineup on a laptop computer to Nicholas and Richard separately—in different locations and about two hours apart. De Torres first showed Nicholas the video lineup at Nicholas's place of work. De Torres instructed Nicholas that the suspect may or may not be in the lineup, and Nicholas was under no obligation to make an identification if he did not recognize anyone. De Torres further instructed Nicholas that facial hair could be shaved or different, and skin tone could be different because of the lighting. Afterwards, De Torres

13

instructed Nicholas not to talk to Richard about the lineup. De Torres then showed Richard the lineup at another location. De Torres gave Richard the same instructions about viewing the lineup. De Torres did not tell Nicholas or Richard that the police had identified a suspect.

Nicholas testified that, at the time he viewed the video lineup, De Torres told him it was possible that the person who robbed him was in that lineup. Nicholas studied the lineup for about fifteen minutes before he made any identification. Nicholas stated with respect to viewing the video lineup: "At that time I seen [sic] [appellant] without gold teeth and I point out that that was him, because I see his face clearly." Nicholas did not talk to Richard about the lineup because De Torres told him not to.

Nicholas identified appellant during the suppression hearing. Nicholas testified that he was able to identify appellant because he remembered him from the robbery and because of the lineup. Nicholas, however, also stated that he would have been able to identify appellant in court without having seen the video lineup because "[t]here's no doubt in my mind." Nicholas was able to remember appellant "[b]ecause he's the one . . . controlling me and everything. . . . And so I see him face to face."

At the conclusion of the first suppression hearing as to Nicholas's identification of appellant, the trial court made the following ruling:

> Based on the state of the record thus far, offense alleged to have been committed on or about January 10, 2010, the videotaped lineup was physically conducted on November 22nd, 2009, and that videotape of the lineup of November 22nd, 2009, was shown to the witness, Nicholas Oupraxay, on January 27th 2010, 17 days after the alleged offense.
>
> The record will reflect that the pretrial procedure in the composition and the videotaping of the live lineup of November 22,

2009, had in its subject six African American males, apparently young, apparently ranging in heights from five-two to five-nine or so, all dressed in similar street clothes, all with some facial, slight hair, mustache or slight chin hair, all with T-shirts or polo shirt, all with jeans or black pants.

And the videotape was pretty clear in terms of skin tone and so forth and so on.

The composition of the lineup itself was not suggestive in the Court's opinion. Also based on the totality of the circumstances, there's no indication that the other — in the totality of the circumstances that there's any substantial likelihood of misidentification.

Identification in this case thus far has been shown to be reliable in terms of the witness had the opportunity to view the — the suspect who robbed him, two suspects who robbed him at the time of the crime and had ample time to view the defendant who was accused of this crime who's been identified by this witness, Nicholas Oupraxay. The witness' degree of attention at the time of the robbery was — has been demonstrated on the record to be lengthy.

The prior description of the witness of — or description of the robbers given by this witness is consistent with the appearance, physical appearance of the defendant. The witness' level of certainty here in open court and him testifying that back then when he identified the defendant and another person in the videotape lineup on January 27th, 2010, that he was positive, a hundred percent positive on both, and the timeframe between the time of the offense and the time of the out-of-court identification was approximately 17 days.

The individuals in the lineup also were similar build and had similar hairstyles. All appear to have shorter type of hairstyles, with the exception of one person who was a little — little broader than the other persons, that seem to be similarly attired and similar in appearance.

The fact that the two defendants happened to be in that lineup, Christian Austin and Mr. Jones, was happenstance in the Court's opinion.

Accordingly, the Court is denying defense motion to suppress illegal identification of defendant and will allow the in-court

identification of this defendant by this witness and hold that it was not tainted by any suggestive pretrial identification procedure.

After the trial court announced its ruling as to Nicholas's identification of appellant, Nicholas resumed his testimony and identified appellant in front of the jury, stating "[j]ust pretty much the face, I can still remember."

During Richard's testimony, one of the prosecutors advised the trial court that she was about to get into the identification issue arose, and the trial court held another suppression hearing out of the presence of the jury. Richard was the only witness to testify at this suppression hearing.

At the hearing, Richard described appellant as being "short" and having "big lips" and "metal teeth or gold teeth." Richard remembered that appellant was shorter than he, but could not recall anything about appellant's weight or whether he had facial hair. Richard identified appellant during the suppression hearing. The video helped Richard remember appellant, but he also stated that his identification of appellant was from his memory of the robbery on January 10, 2010.

The trial court denied the motion to suppress as to Richard's in-court identification of appellant and reiterated its ruling as to Nicholas's in-court identification of appellant. Richard identified appellant in front of the jury.

## C. Analysis

Assuming arguendo that the pretrial video lineup procedure was impermissibly suggestive, appellant must still establish that the nature of suggestiveness of the pretrial lineup gave rise to a substantial likelihood of irreparable identification. *See Adams*, 397 S.W.3d at 764; *Santos*, 116 S.W.3d at 451. As stated before, we make this analysis based on the following factors: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the

witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the time of confrontation; and (5) the length of time between the offense and the confrontation. *Rogers*, 2013 WL 2442194, at *6.

Both Nicholas and Richard had ample opportunity to view appellant during the robbery, and had a high degree of attention as appellant pointed his gun at each of them. Nicholas was alone with appellant in the living room for about twenty-five minutes when they sat on couches opposite each other. When Austin brought Richard downstairs, Richard sat next to Nicholas opposite appellant, who threatened five times to kill Richard. *See Barley*, 906 S.W.2d at 35 (stating that witnesses who are more than "just casual observers of the crime" have more reason to be attentive). The description of appellant given to the police immediately after the robbery was detailed and was fairly accurate of appellant's actual appearance.

In their separate viewings, both Nicholas and Richard identified appellant in the video. Significantly, neither Nicholas nor Richard identified anyone in the January 13, 2010 live lineup when appellant was not in that lineup. At trial, there was "no doubt in [Nicholas's] mind" that appellant was one of the perpetrators because appellant was "controlling" him and he saw appellant "face to face." Richard testified that he identified appellant from his memory of the robbery. Nicholas and Richard viewed the video lineup seventeen days after the robbery, which is a short period of time between those two events. *See Brown*, 29 S.W.3d at 256 (holding that sixty-seven day interval was not of duration to automatically assume that the complainant's memory had faded). We conclude that appellant did not establish by clear and convincing evidence that the video lineup gave rise to a substantial likelihood of irreparable identification.

Appellant also contends under this issue that, without the in-court identification, the evidence is legally insufficient to support his aggravated robbery conviction.[2] When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). The jury is the exclusive judge of the credibility of witnesses and the weight to be given the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Further, we defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence. *Id.* We draw all reasonable inferences from the evidence in favor of the verdict. *Id.* This standard applies to both circumstantial and direct evidence. *Id.*

A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of the property. TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2012). A person commits robbery if, in the course of committing theft and with an intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PENAL CODE ANN. § 29.02(a)(2) (West 2011). A person commits the offense of aggravated robbery when he commits robbery and uses or exhibits a deadly weapon. TEX. PENAL CODE ANN. § 29.03(a)(2) (West 2011).

---

[2] Appellant also contends that without the in-court identifications, the evidence is factually insufficient to support his conviction. Since the Texas Court of Criminal Appeals' decision in *Brooks v. State*, we only review the legal sufficiency of the evidence; we no longer apply a factual sufficiency standard of review. 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.); *see also Griego v. State*, 337 S.W.3d 902, 903 (Tex. Crim. App. 2011) (per curiam). Therefore, we do not address the factual sufficiency of the evidence to support appellant's aggravated robbery conviction.

Appellant's argument, however, ignores the mandate that we consider "all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible" in our sufficiency review. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). The Texas Court of Criminal Appeals explained the rationale for this rule:

> In the event a portion of this evidence was erroneously admitted, the accused may complain on appeal of such error. If his complaint has merit and the error is reversible, *see* [TEX. R. APP. P. 44.2], a new trial should be ordered. But jurors do not act irrationally taking such evidence into account, since they are bound to receive the law from the trial judge. All evidence which the trial judge has ruled admissible may therefore be weighed and considered by the jury, and a reviewing court is obliged to assess the jury's factual findings from this perspective.

*Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988); *see also Moff v. State*, 131 S.W.3d 485, 488–90 (Tex. Crim. App. 2004).

The testimony of a single eyewitness alone is sufficient to support a felony conviction. *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971); *Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). Here, Nicholas and Richard both positively identified appellant as one of the perpetrators to the aggravated robbery. Other than identity, appellant does not challenge any of the elements of aggravated robbery. We concluded above that the impermissible suggestiveness of the November 22, 2009 video lineup, *if any*, did not give rise to a substantial likelihood of irreparable identification. Therefore, any rational fact finder could have found appellant guilty of aggravated robbery beyond a reasonable doubt. *See Johnson v. State*, 176 S.W.3d 74, 77–78 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (holding that evidence was legally sufficient to support conviction for

19

aggravated robbery based on a complainant's testimony and identification).[3]

We overrule appellant's first issue.

### III. COMMENT ON FAILURE TO TESTIFY

In his second issue, appellant claims that, during the punishment phase of the trial, the prosecutor commented on his failure to testify, and the trial court's instruction to disregard was insufficient to cure the harm.

A comment on a defendant's failure to testify violates both the state and federal constitutional privileges against self-incrimination, as well as Texas statutory law. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011); *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011). Such a violation occurs when "the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007). In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character. *Randolph*, 353 S.W.3d at 891; *Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001). It is not sufficient that the comment might be construed as an implied or indirect allusion to a defendant's failure to testify. *Bustamante*, 48 S.W.3d at 765. We view the challenged argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being a permissible

---

[3] Appellant further contends that, "[i]f the lineup was tainted, and if the officer used the witnesses' identification from the lineup to get the warrant, then the search was illegal and the evidence seized was 'fruit of the poisonous tree' and not admissible." Therefore, according to appellant, because the trial court should not have admitted the evidence seized pursuant to the search warrant, the evidence is legally insufficient to support his conviction. Appellant did not raise a separate issue on the legality of the search warrant or cite any authority in support of this contention. In any event, we are to review all the evidence, whether admissible or not, in our sufficiency review. *See Dewberry*, 4 S.W.3d at 740.

20

argument. *Randolph*, 353 S.W.3d at 891. It cannot be said that "'the prosecutor manifestly intended to comment on the defendant's failure to testify, if some other explanation for his remark is equally plausible.'" *Id.* (quoting *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977)). In a case in which the defendant does not testify, a statement that the defendant has not taken responsibility for his actions could constitute an impermissible comment on the failure to testify. *Id.* at 891–92.

A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). The trial court may properly exercise its discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error. *Id.* Whether error requires a mistrial must be determined by the particular facts of the case. *Id.* We review a trial court's denial of a mistrial for an abuse of discretion. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

During the State's closing statement in the punishment phase of the trial, the following took place:

> [THE PROSECUTOR]: The defendants that we're mad at are the ones that are remorseful. They take ownership for their actions. They've learned their lesson. They've never before been in this situation, probably played a small role in it and got caught up. It was an actual mistake. Those individuals are what we call good candidates for probation.
>
> Well, let's look at Mr. Kenneth Ray Jones, and let's determine whether or not he is a good candidate for probation. What do we see? We look at his family. His family doesn't know him. He hasn't lived with his mother since he was 18. He has more connections to people in his gang than he does to his own mother.

21

Let's look at his remorse, his ownership. *You heard his story. Not once did you ever hear him say, yes, I did it.*

[APPELLANT'S ATTORNEY]: Your Honor, I object. The State is commenting on the defendant's failure to testify.

THE COURT: That's sustained. Rephrase —

[APPELLANT'S ATTORNEY]: I ask the jury be instructed to disregard that argument.

THE COURT: The jury's instructed to disregard that argument.

[APPELLANT'S ATTORNEY]: I move for a mistrial, Your Honor.

THE COURT: It's denied at this time. Focus your comments, please.

[THE PROSECUTOR]: You heard his interview with Detective De Torres. At any time did he say, you know what, I'm sorry for what happened to the Oupraxay brothers? At any time did he say, you know what, I'm sorry for what happened to the Guerrero family or the Figueroa family[?]

Not one time did he say that. In fact, all he said is, well, now I wish I didn't drive the car. Now. Now that I've been caught, now that I've been arrested. Now I wish I didn't drive the car.[4]

Assuming without deciding that the prosecutor's argument was an improper comment on appellant's failure to testify, we analyze the trial court's denial of appellant's motion for mistrial under the three factors set forth in *Mosley v. State*:[5] (1) the severity of the misconduct (the magnitude of the prejudicial effect); (2) the measures adopted to cure the misconduct; and (3) the certainty of the punishment assessed. *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007). Except in the most blatant cases, harm from a comment on a defendant's failure to testify is cured by an instruction to disregard. *Moore v. State*, 999 S.W.2d 385, 405–06

---

[4] Emphasis added.

[5] 983 S.W.2d 249 (Tex. Crim. App. 1998).

(Tex. Crim. App. 1999).

With respect to the first factor, any prejudicial effect was not severe. After the trial court instructed the prosecutor to "[r]ephrase" her argument and "[f]ocus [her] comments," the prosecutor argued that appellant did not state in the recorded interview with De Torres that he was "sorry" for what he had done.

With respect to the second factor, the trial court took immediate curative measures by sustaining the objection, instructing the jury to disregard, and instructing the prosecutor to "rephrase" her argument and "[f]ocus [her] comments." The prosecutor immediately turned the jury's attention to appellant's lack of remorse during his statement to De Torres.

With respect to the third factor, the jury heard the evidence during guilt-innocence of appellant's armed threats of violence to Nicholas and Richard during the robbery. During punishment, the jury heard how appellant had robbed Justo Ramirez, Bonnie Figueroa, and the Guerrero family, including his involvement in the shooting of Juan Ernesto Guerrero. The jury also heard how the aggravated robberies had negatively affected the lives of appellant's victims, even to the extent that the Oupraxay brothers, Ramirez, and Figueroa moved from their apartments out of fear of being robbed again. Aggravated robbery is a first degree felony that carries a punishment range of imprisonment for life or five to ninety-nine years and a fine up to $10,000. TEX. PENAL CODE ANN. § 12.32 (West 2011). The jury's assessment of twenty-five years' imprisonment is at the lower end of the full range of punishment. Taking into consideration the jury's imposition of the lower end of the range of punishment, the nature and severity of the crime, and the abundance of evidence of other crimes, we find that that the punishment assessed was certain absent the alleged misconduct. *See Hawkins v. State*, 135 S.W.3d 72, 85 (Tex. Crim. App. 2004) (holding that the court of appeals erred in failing to consider

23

record evidence of prior convictions and prior circumstances of misconduct in determining certainty of punishment assessed). We conclude that the trial court did not abuse its discretion by denying appellant's motion for mistrial.

We overrule appellant's second issue.

## IV. CONCLUSION

Having overruled appellant's issues, we affirm the trial court's judgment.

/s/ Sharon McCally
   Justice

Panel consists of Justices Christopher, Jamison, and McCally.

Do Not Publish — TEX. R. APP. P. 47.2(b).