**Affirmed as Modified and Opinion filed June 6, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00182-CR

---

**LOUIS DOUGLAS ROGERS, Appellant,**

**V.**

**THE STATE OF TEXAS, Appellee.**

---

### On Appeal from the 262nd District Court
### Harris County
### Trial Court Cause No. 1306523

---

## O P I N I O N

A jury found appellant Louis Douglas Rogers guilty of murder and assessed his punishment at ninety-nine years' confinement. On appeal, Rogers raises four issues: (1) the prosecutor's alleged presentation of false testimony by two witnesses violated ethical duties and Rogers's fundamental due-process rights; (2) an officer's testimony concerning the credibility of one of the witnesses violated due process and fundamental fairness; (3) the photo array used for the out-of-court identification of Rogers was impermissibly suggestive; and (4) no evidence

supports the judgment against Rogers for court costs. We modify the judgment to delete the court costs and affirm the judgment as modified.

## I

Rogers's girlfriend, Ketural LeBlanc, lived at the Walnut Bend apartment complex and shared her apartment with Rogers. On the morning of May 15, 2011, eighteen-year-old Shan Davis, the complainant, was playing with a basketball at the complex when LeBlanc walked by and recognized the ball as one she had given to the children of a friend, Marquita Boston. LeBlanc asked Davis why he had the ball, and Davis cursed at her. LeBlanc continued on her way to visit Boston, who also lived in the complex.

At trial, LeBlanc testified that Rogers joined her at Boston's apartment about ten minutes after she arrived. Rogers was wearing a white t-shirt, red shorts, and red shoes. LeBlanc told Rogers that Davis had cursed at her. Rogers went outside and confronted Davis. After about five minutes, Rogers returned, took LeBlanc's apartment key from around her neck, and went to LeBlanc's apartment. LeBlanc followed Rogers and, once inside, LeBlanc told Rogers to calm down, but he pushed her out of the way and left.

LeBlanc then returned to Boston's apartment so that she could take Boston's children to play with her son while Boston went to the store. LeBlanc and Boston left Boston's apartment with the children, and as they neared one of the apartment gates they heard multiple gunshots. Davis had been shot nine times in the head, neck, and torso, and died at the scene. Frightened by the gunshots, LeBlanc and Boston "just ran." Police arrived a short time later. LeBlanc was questioned by detectives at her apartment and again at the police station.[1]

---

[1] LeBlanc's interview at the station was recorded, and portions of it were played for the jury. LeBlanc's recorded statement appears to conflict with her trial testimony.

2

At trial, LeBlanc denied or could not recall telling the detectives that Rogers confronted Davis or that Rogers shot Davis. LeBlanc did testify, however, that while the detectives were at her apartment she showed them where Rogers hid a gun under the dishwasher, but the gun was not there.[2] Shortly after she was interviewed, LeBlanc left town because she feared retribution from Davis's family.

Boston's testimony differed in some respects from LeBlanc's. Boston testified that after Rogers and LeBlanc left her apartment the first time, they returned together about five minutes later, and both seemed nervous and anxious. Rogers appeared upset and told the women they needed to leave, and so they left.[3] On the way out, Boston saw Rogers and Davis standing near each other. Boston testified that Rogers and Davis were the only people in the area at that time.

Boston continued to the store, and as she turned a corner she could no longer see the two men. When she heard the gunshots, however, Boston turned back and ran toward her apartment. As she approached, she saw Rogers holding a gun and Davis falling over. Boston testified that Rogers was wearing a white t-shirt and red shorts, and as he ran away she saw him tucking a gun under his shirt. According to Boston, Rogers ran across the street to the opposite side of the Walnut Bend apartment complex before he disappeared from view. Boston testified that she had no doubt that it was Rogers who shot Davis. Boston also testified that she had seen Rogers with a Tec-9 weapon many times before the shooting, and she identified the murder weapon as the Tec-9 belonging to Rogers.[4]

---

[2] At trial, LeBlanc testified that she told Rogers to get rid of the gun some time before the shooting and assumed he had done so.

[3] Boston also testified that LeBlanc's child was with them when they left her apartment, but LeBlanc testified that only Boston's children were with them because her child was playing at a friend's apartment.

[4] Forensic evidence confirmed that bullet casings found at the scene and the bullets which killed Davis were fired from the Tec-9 in evidence.

After the shooting, the police took Boston to the police station to interview her, but she did not tell them about seeing Rogers holding a gun and Davis falling to the ground. She also did not tell them about seeing Rogers running away with a gun in his hand. Boston explained that she did not tell detectives everything she had seen when they interviewed her because she feared that Rogers would shoot her "for no reason" just as he had shot Davis. She did, however, identify Rogers from a photo array the police showed her the next day.

As a result of their interviews, detectives developed Rogers as a suspect and obtained a warrant for his arrest. The detectives eventually located Rogers in Bastrop at the home of an aunt. When police knocked on the door, Rogers's aunt, who seemed very scared, pointed inside and whispered that Rogers was there. Rogers was arrested, and the police retrieved a pair of red shoes from the home. Although police believed the murder weapon was a Tec-9, Rogers did not have a weapon when he was arrested.

Two days after the shooting, police arrested Jurron Williams for aggravated robbery and recovered a Tec-9 from his backpack.[5] At trial, Williams explained how he came to possess the weapon. He testified that he was by the pool at the Walnut Bend apartments on the day of the shooting when Rogers appeared at the pool and began to talk to another person known as Ke-Ke. Rogers seemed out of breath, and Williams heard Rogers tell Ke-Ke that he "had to kill him," to which Williams replied, "no you didn't. All you had to do was fight him." Williams testified that Rogers was wearing a white t-shirt, red shorts, and red shoes.

According to Williams, Rogers jumped into the pool fully clothed and swam

---

[5] Williams also acknowledged that he pleaded guilty to the aggravated robbery and received deferred adjudication, and that one of the conditions of deferred adjudication was that he testify truthfully in this case.

back and forth. When Rogers came out of the pool, he asked Williams and another person if he could wear some of their clothes, and they agreed. Rogers changed clothes in front of them. Williams did not see Rogers with a weapon, but he stated that he overheard Rogers telling Ke-Ke that he had hidden the gun in the apartment's laundry room. Williams then went to the laundry room and retrieved the Tec-9, which he kept in the backpack until the police discovered it. Williams was seventeen at the time.

On cross-examination, Williams testified that, before his testimony that day, he had never told the police this version of events. Williams acknowledged that, at the time of his arrest, he told officers that he had been walking past the laundry room when he saw a backpack that happened to have a gun inside. Williams told the officers he thought it was his "lucky day." He never said anything about seeing Rogers at the pool or any of the other information about which he had testified. Williams acknowledged that he remained silent even though he feared he might be charged in Davis's murder because he had been arrested with the murder weapon; Williams explained that he did so because the "code of the street" was not to "snitch."

Yashi Duhon, a passerby, also testified at trial. On the day of the shooting, she was visiting her boyfriend who lived in the apartments across the street. She and her boyfriend were in his car about to exit through his complex's gate when they heard the gunshots. Duhon saw someone running from the apartment complex across the street toward the exit gate of her boyfriend's complex. The man passed near the passenger side of the car where she was sitting. Duhon described him as a light-skinned black man, wearing a long white t-shirt, red shorts, and red or black shoes. Duhon testified that she got a good look at his face. Duhon also noticed that the man seemed to have something tucked under his shirt, but she could not see

5

what it was. Police later showed Duhon a photo array of six men and asked her if she could identify the man she saw. Duhon testified that she was "90 percent" sure that the person shown in position 2 of the array, who was Rogers, was the man she saw on the day of the shooting.[6] Duhon also identified Rogers in court.

## II

In his first issue, Rogers complains that the testimony of Boston and Williams conflicts with the statements they gave to police when they were initially interviewed about the crime. Rogers suggests that, once it became apparent the witnesses' testimony differed materially from their statements, the State had a duty to stop the testimony, approach the bench, and inform the court that the witnesses may be perpetrating a fraud on the court. Rogers cites Texas Disciplinary Rules of Professional Conduct 3.03 (candor toward the tribunal) and 3.04 (fairness in adjudicatory proceedings), as well as cases discussing the State's duty not to knowingly use false or misleading testimony to obtain a conviction.

The State argues that Rogers did not preserve the issue for review because it was not raised in the trial court. In anticipation of this argument, Rogers acknowledges that his counsel did not object to the witnesses' testimony on this basis, but argues that no objection was necessary to preserve the issue because the presentation of allegedly false testimony deprived him of due process and therefore is fundamental error.

Generally, to preserve error for appellate review, a party must make timely objection in the trial court. Tex. R. App. P. 33.1(a); *Clark v. State*, 365 S.W.3d

---

[6] Duhon's recollection differed from that of Officer Robles, who prepared the photo array and interviewed Duhon. At trial, Robles did not recall Duhon stating that she was "90 percent" sure it was the person in position 2. He testified that she remarked that she believed it was the person in position 2, but that he looked younger than the person in the photo. Robles also testified that Duhon's boyfriend was unable to identify anyone form the photo array.

6

333, 339 (Tex. Crim. App. 2012). Even constitutional rights may be forfeited if a timely and specific objection is not made. *Saldano v. State*, 70 S.W.3d 873, 887 (Tex. Crim. App. 2002). Exceptions to the general rules of error preservation exist in two narrow categories: violations of rights which are "waivable" and denials of "systemic requirements." *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004); *Saldano*, 70 S.W.3d at 888. Waivable rights are those rights of litigants which must be implemented by the system unless expressly waived. *Mendez*, 138 S.W.3d at 341. Examples of waivable rights include the right to effective assistance of counsel and the right to trial by jury. *Saldano*, 70 S.W.3d at 888. A systemic requirement is a law that a trial court has a duty to follow even if the parties wish otherwise. *Mendez*, 138 S.W.3d at 340. Systemic requirements, which are not necessarily constitutional, include jurisdiction of the subject matter and jurisdiction of the person. *Id.* at 341. Complaints of error involving waivable rights and denials of systemic requirements have been described as "fundamental" error for which no objection is required. *See id.*

To support the proposition that the State's failure to alert the trial court to allegedly false testimony constitutes fundamental error which may be raised for the first time on appeal, Rogers cites *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000). In *Blue*, a plurality of the judges on the Court of Criminal Appeals held that the trial judge's comments before the jury, which tainted the defendant's presumption of innocence, amounted to fundamental error that required no objection. *Id*. at 132–33.

Because *Blue* is a plurality opinion, it is not binding precedent and we are not obligated to follow it. *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001); *Muhammed v. State*, 331 S.W.3d 187, 194 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Moreover, *Blue* is factually distinguishable because Rogers

7

does not complain that the trial court in some way undermined the presumption of innocence afforded to him.

In this case, Rogers argues that because the witnesses' testimony at trial differed from their initial statements to police, the witnesses' testimony must be false. But both Boston and Williams were questioned about the discrepancies between their initial statements and their trial testimony, and both were cross-examined extensively by defense counsel.[7] Thus, the jury had the opportunity to consider the differences between the witnesses' statements and their testimony, as well as the witnesses' explanations for any conflicts, and the jury was entitled to determine the witnesses' credibility and resolve any conflicts in the evidence. *See Alexander v. State*, 282 S.W.3d 701, 711 (Tex. App.—Houston [14th Dist.] 2009, pet ref'd) (holding trial court did not abuse its discretion by failing to grant motion for new trial on grounds that State used false testimony when jury was presented with conflicting opinion testimonies and had an opportunity to resolve conflicts).

Nothing in the record demonstrates that the prosecutor engaged in any unethical conduct or that the trial testimony of Boston or Williams was false. Therefore, Rogers has failed to demonstrate prosecutorial violations of disciplinary rules amounting to fundamental error. *See Clark*, 365 S.W.3d at 340 (holding alleged prosecutorial misconduct did not rise to the level of fundamental error); *see also House v. State*, 947 S.W.2d 251, 253 (Tex. Crim. App. 1997) (declining to address claim that alleged violation of disciplinary rule deprived appellant of fair trial when complaint was not raised in trial court). Accordingly, Rogers has failed to preserve his complaint on appeal. We overrule Rogers's first issue.

---

[7] Indeed, Rogers acknowledges that "the defense presented a masterful cross-examination."

## III

In his second issue, Rogers contends the trial court erred by allowing Officer Jason Robles, who initially interviewed Boston, to opine that Boston was not lying during her testimony. According to Rogers, allowing Robles to "explain the changing testimony of the State's star witness" in this way violated due process and fundamental fairness. Rogers complains of the following colloquy:

Q. [Prosecutor:] Officer Robles, just to be clear, I didn't tell you what Ms. Boston said, did I?

A. [Robles:] No.

Q. But I asked you if she had said certain things to you, right?

A. That's correct.

Q. Now, Officer Robles, based upon [defense counsel's] questioning, do you think Marquita Boston is lying now?

> [Defense Counsel:] Object as to speculation, Judge.

> The Court: Overruled.

A. No.

Q. Why not?

A. It's very common for witnesses not to be one that wants to point the finger in court.

> [Defense Counsel:] I object. That's speculation, Your Honor.

> The Court: Overruled.

We need not address Rogers' issue, however, because his trial objections do not comport with the issue now raised on appeal. As discussed above, to preserve error for appellate review, an appellant must make a timely objection in the trial court. Tex. R. App. P. 33.1(a); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 2002). A defendant has not preserved error when the complaint on appeal does not comport with the objection made to the trial court. *See Wilson v. State*, 71

9

S.W.3d 346, 349 (Tex. Crim. App. 2002).

At trial, Rogers's counsel objected to Robles's testimony as "speculation." But, on appeal, Rogers argues that Robles's testimony invaded the jury's province by improperly commenting on Boston's truthfulness. *See Schutz v. State*, 957 S.W.2d 52, 67–68 (Tex. Crim. App. 1997). Rogers did not voice this objection in the trial court, and the objection he made was not sufficient to inform the trial court of the complaint he now makes on appeal. An objection stating one legal theory may not be used to support a different legal theory on appeal. *Zemen v. State*, 912 S.W.2d 363, 366 (Tex. App.—Houston [14th Dist.] 1995, no pet.) (citing *Rezac v. State*, 782 S.W.2d. 869, 870 (Tex. Crim. App. 1990)). Because Rogers's objection at trial does not comport with his appellate issue, Rogers has not preserved this issue for review. To the extent that Rogers may have attempted to raise a complaint of fundamental error, thereby excusing any lack of preservation, we hold that the error raised here does not rise to the level necessary to constitute fundamental error. *See Saldano*, 70 S.W.3d at 889 ("We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence."). We overrule Rogers's second issue.

IV

In his third issue, Rogers contends that the photo array used for out-of-court identification was impermissibly suggestive because three of the six photos "were easily rejected because of the skin color" and therefore "gave a substantial likelihood of misidentification." At the hearing on Rogers's motion to suppress, Rogers argued that the photo array was impermissibly suggestive because it allowed the witnesses to automatically exclude half of the individuals included in the array.

A

Whether the pre-trial suspect-identification procedure in this case was impermissibly suggestive is a mixed question of law and fact that does not turn on an evaluation of witnesses' credibility and demeanor, and we review such questions de novo. *See Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998); *Brown v. State*, 29 S.W.3d 251, 254 (Tex. App.—Houston [14th Dist.] 2000, no pet.).[8]

An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008); *Ibarra*, 11 S.W.3d at 195. The test is whether, considering the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Luna*, 268 S.W.3d at 605 (quoting *Ibarra*, 11 S.W.3d at 195) (internal quotation marks omitted).

This review involves a two-step analysis: (1) whether the out-of-court identification procedure was impermissibly suggestive; and, if so, (2) whether that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *See Simmons v. United States*, 390 U.S. 377, 384 (1968); *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). If we reach the second step, we consider the following factors in determining whether an impermissibly suggestive procedure gave rise to a substantial likelihood of irreparable misidentification: (1) the witness's opportunity to view the criminal at the time of crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the time of

---

[8] Mixed questions turn on an evaluation of credibility and demeanor "when the testimony of one or more witnesses, if believed, is *always* enough to add up to what is needed to decide the substantive issue." *Loserth*, 963 S.W.2d at 773 (citing *Miller v. Fenton*, 474 U.S. 104, 114–15 (1985)).

confrontation; and (5) the length of time between the offense and the confrontation. *Luna*, 268 S.W.3d at 605.

When examining the above factors, courts are to focus on the reliability of the identification. "Reliability is the linchpin in determining the admissibility of identification testimony." *Id*. Thus, "the identification testimony will be admissible if the indicia of reliability outweigh the apparent corrupting effect of the unnecessarily suggestive pretrial occurrence." *Harris v. State*, 827 S.W.2d 949, 959 (Tex. Crim. App. 1992). The burden is on the defendant to show by clear and convincing evidence that the in-court identification is unreliable. *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993).

Although the better practice may be to get as many individuals as possible who fit the suspect's description, it is not essential that all individuals be identical in appearance. *See Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985) (stating that varying heights, weights, and skin colors of persons in photo array did not render array impermissibly suggestive). Neither due process nor common sense requires such exactitude. *Id*.

B

At the motion-to-suppress hearing, Officers Robles and Robert Blain testified, as did two witnesses: Yashi Duhon and Endurance Sanyamandwe. Robles testified that he prepared the photo array. Robles explained that computer software provides images similar to the suspect's booking photo, and from those Robles selected the images to use. The software would then randomly position the photos in the array. In this case, Rogers's photo was in position 2. Robles testified that all of the photos were images of black males with similar characteristics and features.

Robles showed the photo to Duhon, who testified that she was "90 percent

12

sure" the man she saw at the complex the day of the shooting was the man in position 2, although she thought the suspect looked younger like the one in position 4. Duhon testified that the man she saw was a light-skinned black man, wearing a white t-shirt, red shorts, and red or black shoes, and he appeared to be holding something under his shirt. Duhon explained that, as the man ran past the vehicle she was in, he came within four feet of her, close enough for her to reach out and touch him. She testified that the man was in her field of vision for about fifteen seconds. Duhon also identified Rogers in court, and testified that her identification of Rogers was based on her recollection and not as a result of having seen his picture in the photo array.

Sanyamandwe testified that he was in the parking lot of his church when he heard gunshots. He turned toward the sound and saw a man running away from the direction of the gunshots to the apartments across the street. The man was about 110 yards from him. Sanyamandwe testified that the man was a young black man, wearing a white t-shirt and red shorts. However, Sanyamandwe could not tell if the man's complexion was light or dark. When shown the photo array, Sanyamandwe recalled eliminating some of the persons but could not remember which ones. Sanyamandwe was unable to identify Rogers in the courtroom.

Blain testified that he showed the photo array Robles prepared to Sanyamandwe. According to Blain, Sanyamandwe concluded that the individual he had seen was not in positions 1, 3, or 5, but he was not sure about the other positions. Sanyamandwe's wife was also shown the photo array, but she was unable to identify the man she had seen the day of the shooting. On cross-examination, Blain agreed that the persons in position 3 and 5 of the photo array had darker complexions than the persons in positions 2, 4, or 6.

The trial court denied Rogers's motion to suppress. At trial, Robles, Blain,

13

and Duhon offered substantially similar testimony. Sanyamandwe did not testify.

Based on our review of the photo array in evidence and the testimony of the witnesses, we conclude that Rogers has failed to demonstrate that the photo array was impermissibly suggestive. Although the complexions of some of the individuals included in the array varied from that of Rogers, minor discrepancies among lineup participants will not render a lineup impermissibly suggestive. *See Buxton*, 699 S.W.2d at 216; *see also Johnson v. State*, 901 S.W.2d 525, 535 (Tex. App.—El Paso 1995, pet. ref'd) (holding that photo spread was not impermissibly suggestive even though defendant's photo appeared darker than the others when defendant failed to establish the others were not of the same general skin color as he was); *Clay v. State*, 702 S.W.2d 747, 749 (Tex. App.—San Antonio 1985, pet. ref'd) (stating that even if the photos of others had different shades of the same skin color as defendant, that fact would not by itself render the lineup impermissibly suggestive). Rogers does not argue that the identification process was tainted in any additional way.

Because we conclude that the pretrial identification procedure was not impermissibly suggestive, we need not address whether the procedure created a substantial likelihood of misidentification. We overrule Rogers's third issue.

V

In his fourth issue, Rogers contends that the evidence is insufficient to support the court costs of $594 assessed against him in the judgment. Rogers argues there is no documentation supporting this fee as is mandated by article 103.001 of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 103.001 ("A cost is not payable by the person charged with the cost until a written bill is produced or is ready to be produced, containing the items of cost, signed by the officer who charged the cost or the officer who is entitled to receive payment

14

for the cost.").

Rogers also cites as support this court's recent opinion in *Johnson v. State*, 389 S.W.3d 513 (Tex. App.—Houston [14th Dist.] 2012, pet. granted). In *Johnson*, the court held that when the record does not support the assessment of a certain dollar amount in costs, the trial court errs in entering a specific dollar amount in its judgment. *Id.* at 516. Rogers points out that he specifically requested the district clerk to include the bill of costs in the appellate record, but none was provided.[9]

The State responds that there are numerous provisions in the Texas Code of Criminal Procedure authorizing various court costs to be paid by a defendant when convicted of a felony offense after a trial. The State suggests ten specific articles of the Code of Criminal Procedure and three sections of the Local Government Code providing for fees that, if assessed against Rogers, would add up to an amount of at least $664. Therefore, the State maintains, the evidence is sufficient to support the $594 in court costs reflected in the judgment.

We disagree with the State's argument. To affirm the judgment for costs merely because a number of statutes authorize certain costs or fees that could have been assessed against the defendant—without regard to whether they were actually assessed—would be speculative. Moreover, without any indication in the record which specific fees or costs were actually assessed, a defendant has no way to challenge their correctness on appeal or as provided under article 103.008 of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 103.008 (authorizing

---

[9] After Rogers's brief was filed, the court received two supplemental clerk's records containing certified copies of Justice Information Management System (JIMS) computer printouts reflecting Rogers's "cost bill assessment" totaling $594 and, as amended, a cost bill assessment totaling $564. Neither party discusses these supplemental records. In *Johnson*, this court stated that an unsigned computer printout from JIMS that does not show it was brought to the attention of the trial judge is not an actual bill of costs under article 103.001 of the Texas Code of Criminal Procedure. *See Johnson*, 389 S.W.3d at 515–16 & n.1.

defendant to file a motion within one year after the date of the final disposition of a case in which costs were imposed to correct any error in the costs). We therefore reject the State's argument that the record supports the $594 in costs assessed in Rogers's judgment merely because the trial court is authorized to impose applicable costs which, in some hypothetical combination, would equal or exceed the total amount of costs actually assessed in the judgment.

The trial court did not err in ordering Rogers to pay court costs, as such costs are mandated by law, but the court did err in entering a specific dollar amount without any support in the record for that dollar amount. *See Johnson*, 389 S.W.3d at 516. Because there is no evidence in the record to support the trial court's assessment of a specific dollar amount as court costs, we sustain Rogers's fourth issue and reform the trial court's judgment to delete the specific dollar amount of costs assessed. *See id.*; *see also Mayer v. State*, 309 S.W.3d 552, 554–56 (Tex. Crim. App. 2010) (holding that sufficient evidence must support an assessment of costs in a judgment).

\* \* \*

We modify the trial court's judgment to delete the listing of a specific amount of court costs and affirm the judgment as modified.

/s/     Jeffrey V. Brown
        Justice

Panel consists of Justices Frost, Brown, and Busby.
Publish — TEX. R. APP. P. 47.2(b).