

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-21-00079-CR

---

THOMAS ALAN AULD, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 18889

---

Before Morriss, C.J., Stevens and van Cleef, JJ.
Opinion by Chief Justice Morriss

# OPINION

An Upshur County jury found Thomas Alan Auld guilty of eight counts of indecency with a child by contact.[1]  Of the eight counts, six accused Auld of touching Kate's[2] genitals, and two accused him of causing her to touch his genitals.  Auld now appeals, alleging various errors.  We modify the judgments by changing the recited degree of offense for each count from a first-degree felony to a second-degree felony to accurately reflect the nature of the convictions.  We affirm the modified judgments, because (1) sufficient evidence supports Auld's convictions, (2) Auld did not preserve his complaints about admission of extraneous-offense evidence at guilt/innocence, (3) Auld failed to preserve his complaints about two witnesses' testimony, (4) admission of witness testimony under the excited-utterance exception to the rule against hearsay was harmless error, and (5) Auld has not established ineffective assistance of counsel.

## (1)     Sufficient Evidence Supports Auld's Convictions

Admittedly, much of the evidence on the eight charges against Auld was not a model of clarity.  Most came from Kate, the victim.  The State filled in added evidence from Sexual Assault Nurse Examiner (SANE) Misty Edzards; Kate's stepfather, Charles; Kate's close friend and a minor, Cassie; and Kate's close friend and relative, Autumn, also a minor.

Kate was twelve years old at trial.  When she was ten or eleven years old, Kate often spent the night or weekend with Autumn, who was related to both Auld and Kate.  Kate's trial

---

[1]See TEX. PENAL CODE ANN. § 21.11.  After proof of a prior felony conviction, Auld was sentenced to life imprisonment on each count.

[2]We use pseudonyms, and only vaguely reference any connection of Auld to "Kate" to protect the identities of the complainant and any other minors.  See TEX. R. APP. P. 9.10.

2

testimony described multiple incidents in which she was alone with Auld and he engaged in illegal sexual contact with her. Over the course of Auld's predations on Kate, Auld lived in three different houses, and those houses were used to identify the timing of events relevant to the charges. According to Kate, Auld lived in houses on Crawford and Trinity Streets and, for a couple of weeks, lived in Kate's family's house in Bettie.

From Kate's testimony, it appears that most of Auld's charged behavior occurred on evenings he drove Kate home after she had visited Autumn overnight or on weekends. Kate described an occasion when Auld drove her home from his house on Trinity Street and suggested they play a game, dare or die, which Kate played with her cousins.[3] Kate elected for Auld to choose a "dare." Auld's dare to her was for her to touch his penis. Auld unbuttoned his pants, "grabbed" Kate's hand, placed it on his erect penis, and "moved" Kate's hand on his penis. When Kate was reluctant to choose a dare, Auld elected to touch her. When asked how Auld touched her on that occasion, Kate stated that he put his hand on the skin beneath her underwear in her "private area" and moved his hand. He also touched her "other private area," under her shirt. Auld engaged in those contacts while driving, stopping only when he reached "the last corner" before Kate's house. Auld warned Kate not to tell anyone for two expressed reasons: first, because he would get in trouble and, second, because Kate would never get to see Autumn again.

---

[3]According to Kate, "Dare would be like the usual dare that you would play in truth or dare and die would be something worse than that." However, there was no threat of violence. "[I]t was just straight up dares," as Kate explained.

Kate testified that she would stay overnight with Autumn on almost all occasions when Autumn stayed with Auld. The pattern during that time frame was for Autumn to be with Auld every other weekend. When it was time for Kate to go home, she said that usually her mother or stepfather would pick her up. Kate said that, "most of the time," her mother retrieved her from the house on Trinity, while Auld would usually take her when he was living on Crawford Street.

When Auld took her home, it was "mainly" during the day, but sometimes in the evening. When he took her home during the day, no untoward conduct occurred. But there were nighttime trips, too.

When Auld took Kate home at night, the two were always alone in his car. Kate testified that "about half the time" Auld took her home at night, he would engage in sexual contact with her.

Kate's stepfather, Charles, testified that Auld lived at the house on Crawford Street "[p]robably about seven or eight months" sometime between late 2017 and 2018. Around early 2019, Auld moved to Trinity Street where he lived with his mother. Charles told the jury that, when Auld lived at the house on Crawford, he usually brought Kate back after staying the night or weekend with Autumn. "Sometimes" Auld returned Kate during the daytime, with other children in the car. When Auld brought Kate home at night, they were alone in the car. Sometime later, Auld came to live with Kate, her mother, and her stepfather, during which time Auld would occasionally babysit Kate and her siblings and had opportunity to be alone with them or her.

4

The last time Auld touched her was before the COVID pandemic began in 2020. About a year after the last touching, she told her friend Cassie, who urged Kate to tell her parents. Kate delayed any report, as she was worried that, if she told her mother, that might interrupt her stepfather's plans to adopt her. Cassie told Kate's mother a few days later.

Auld challenges the sufficiency of the evidence to support eight allegations of indecency by contact. The indictment's counts alleged as follows:

I.      Auld touched Kate's genitals on or around March 1, 2019;

II.      Auld caused Kate to touch Auld's genitals on or around March 15, 2019;

III.      Auld touched Kate's genitals on or around April 1, 2019;

IV.      Auld caused Kate to touch Auld's genitals on or around April 15, 2019;

V.      Auld touched Kate's genitals on or around May 15, 2019;

VI.      Auld touched Kate's genitals on or around June 1, 2019;

VII.      Auld touched Kate's genitals on or around June 15, 2019;

VIII.   Auld touched Kate's genitals on or around August 1, 2019.[4]

Kate could not recall when Auld lived in a particular house. As the State is not bound by the indictment's dates,[5] we will look for specific evidence that could rationally satisfy each count.

---

[4] Each count alleged the other statutory requisites, that Kate was a child under the age of seventeen and that Auld engaged in each act of sexual contact with the intent to arouse or gratify his sexual desire. *Cf.* TEX. PENAL CODE ANN. § 21.11(c). Auld does not challenge the sufficiency of the evidence on those elements.

[5] "The State is not bound by the date alleged in the indictment and may prove that an offense was committed before, on, or after the date alleged, so long as the date proved is a date anterior to presentment of indictment and the crime's occurrence is not so remote as to be barred by limitation." *Scoggan v. State*, 799 S.W.2d 679, 680 n.3 (Tex. Crim. App. 1990). Auld does not challenge those elements. His appellate argument is that the evidence does not prove beyond a reasonable doubt eight separate criminal acts.

5

When we review the sufficiency of the evidence, we are to determine whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022); *see Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). This leaves the jury the responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Witcher*, 638 S.W.3d at 710. The fact finder may and should draw "reasonable inferences" from the evidence but may not engage in "mere speculation." *Id.*

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Williamson*, 589 S.W.3d at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim.

6

App. 2007) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985))). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* at 297 (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)) (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based on an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)). The jury is permitted to draw any reasonable inference from the evidence as long as it is supported by the record. *See Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). Contradictions in the evidence are reconciled by the jury and will not result in reversal so long as there is enough credible testimony to support the verdict. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982). Additionally, the jury may use "common sense and apply common

7

knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." *Wawrykow v. State*, 866 S.W.2d 87, 88–89 (Tex. App.—Beaumont 1993, pet. ref'd).[6]

One difficulty the State has on this record is that, though it asked Kate frequently how many times Auld drove her home in the dark, alone with her, Kate invariably answered that she did not remember.[7]

Based on the testimony at trial, Auld had access to Kate on occasions connected to three different houses: (1) the Crawford house where he lived for a time, (2) the Trinity house where he lived with his mother at a different time, and (3) the Bettie house where Kate lived with her parents. Kate visited Autumn at the Crawford and Trinity houses. Auld visited the Bettie house and, for a short time at the end of the sequence of events, lived there. Auld had access to Kate at each location and, as described below, when he drove her home from either the Crawford house or the Trinity House. Though our analysis below ties particular events to specific numbered charges, that connection is for convenience, not because any specific event was required to be tied to any particular numbered count against Auld. For our purposes here, the State's obligation

---

[6]Earlier in 2022, we were reversed by the Texas Court of Criminal Appeals in a case in which, when we were charged to assess the legal sufficiency of the evidence to support a conviction, we put too much focus on the lack of precision of certain expressions used in testimony concerning the "30 or more days" element of the offense of continuous sexual abuse. *See Witcher*, 638 S.W.3d at 709–10. In reversing our holding that the evidence was insufficient to establish that timing element, the court, in a 5-4 opinion, held that phrases like "give or take" and "around that time" can be legally sufficient to establish the timing element, when the other evidence contains enough margin in the referenced time periods to support a finding of at least thirty days, in spite of some of the testimony being inexact. The question before us, therefore, is not whether the evidence is particularly clear or technically precise; the question put to us is whether sufficient evidence supports each of the eight convictions. We believe that, using the *Witcher* standard noted above, it does.

[7]Remember that Kate was twelve years old at the time of her trial testimony and ten to eleven years old at the time of the alleged abuse.

to support its eight counts was to provide sufficient evidence of six instances in which Auld touched Kate's genitals and two in which he caused her to touch his penis, regardless of how the instances might be matched to the numbered counts. From the following, we conclude that the State met its obligation.

According to Kate's testimony, Auld initiated a game of dare or die with Kate one particular evening while driving her home from the Trinity house, during which Auld made Kate touch his penis and he touched her inside her genital area, skin on skin. This evidence supports Auld's convictions under counts I and II.

Later, the State engaged in the following dialogue with Kate:

> [State]: Let me ask it this way, [Kate], from the times that [Auld] took you home from the Crawford home in Gilmer, were there *times* that he touched in your genitals area?

> [Kate]: Yes, sir.

> . . . .

> [State]: Did he have you touch his genitals, penis, in the car?

> [Kate]: Yes, sir.

> [State]: If I asked you those same questions about the Trinity Street home, would your answers be the same?

> [Kate]: Yes, sir.

(Emphasis added.)

Given the State's use of the word "times," the foregoing testimony describes more than one instance of Auld touching Kate's genitals when Auld took her home from the Crawford house. In response to this questioning, Kate further acknowledged that Auld caused her to touch

9

his penis on the drive home from the Crawford house. From this evidence, the fact-finder could reasonably and logically conclude that there were at least two instances in which Auld touched Kate's genitals when he took her home from the Crawford house and that there was at least one instance in which Auld caused Kate to touch his genitals on the drive home from the Crawford house.

As referenced above, the State posed the same questions to Kate as to the Trinity Street house and received the same affirmative answer. Kate had already testified that Auld touched her genitals and that he caused her to touch his penis on the way home from the Trinity Street house. But from this additional testimony, the jury could have rationally and logically concluded that there were at least two instances in which Auld touched Kate's genitals when he took her home from the Trinity house and that there was at least one instance in which Auld caused Kate to touch his genitals on the drive home from the Trinity house.

Putting together the foregoing evidence as to the Crawford and Trinity houses, there is legally sufficient evidence to support Auld's convictions on counts I through VI, two of her touching him and four of him touching her.

For a brief period, Auld lived in Kate's Bettie home. During that time, in the bathroom of Kate's home, Auld touched Kate's "private parts" inside her clothing. Since Kate had previously described her "private parts" as her genital area, this provides legally sufficient evidence supporting another instance of Auld touching her genitals, in a situation not involving a car trip, thus providing evidentiary support for count number VII, that is, one more count of him touching her.

10

As to count VIII, there are at least two ways a rational jury could have found evidentiary support to convict Auld on that count. We set out below two paths to evidentiary support for count VIII, that is, one more count of him touching her.

*Count VIII, Path One (at Bettie house):* During the re-direct examination of Kate, the State questioned Kate to provide a summary of her previous testimony. Kate had the following exchange with the State:

> [State]: Okay. [Kate], what you've told this jury under oath about what [Auld] did to you, did those things happen?
>
> [Kate]: Yes, sir.
>
> [State]: Do you have any doubt in your mind that those things happened?
>
> [Kate]: No, sir, no doubt.
>
> [State]: And I'm not going to go back through all of those detailed difficult questions with you again, but, [Kate], when, as you've told the jury under oath that [Auld] would touch you, would that be on the drive home alone in the car?
>
> [Kate]: Yes, sir.
>
> [State]: Would it also be *at times* when he would babysit you at your home in Bettie?
>
> [Kate]: Yes, sir.

(Emphasis added.)

In her interview with SANE Edzards, as reflected in the body diagram in evidence, Kate used "up here" to indicate her breast area. When indicating her genitals, she used "down there" and "private parts." As to the male body diagram, Kate referred to male genitals as "down there"

11

and "private part."  Additionally, during her interview with Edzards, Kate made the following statements,

> *[Auld] messed with me, touch me in places he shouldn't touch me.  Down here and up here (points between legs and breast)*.  We were in the car and play truth or dare or some game or something.  He would rub me with his hand outside my clothes and inside me and he dared me and threatened me to never see [Autumn] again if I didn't.  In the front of my private part.  *A few times at his house and a few times at his house while he was babysitting us*.  He made me touch his private, he would make me play with it with my hand.[8]

(Emphasis added).  Edzards also testified that Kate told her these events happened while Kate was ten and eleven years old, in 2019, and that Kate said these events happened "several times."

Kate's testimony that Auld touched her "at times" at the Bettie house suggests more than one incident occurred.  Additionally, the touching that Kate was being asked about was the improper touching Kate originally described during her direct examination.  With respect to the touching incident that occurred at the Bettie house, Kate testified on direct examination that Auld touched her "private parts," which she used to refer to her genital area.  Similarly, Kate testified that, when she was alone in the car with Auld, he would touch her private area under her underwear and her other private area on her chest.  Based on this evidence, the fact-finder could reasonably infer that, on the other occasion on which Auld improperly touched Kate at the Bettie house, he did so in the same manner, that is, by touching both her chest and her genitals.  This testimony supports at least one additional instance of Auld touching Kate's genitals, thus providing evidentiary support for count number VIII.

---

[8]The punctuation in this excerpt is Edzards's.

*Count VIII, Path Two (going home from Trinity house):* The State also introduced other evidence that the jury could have considered in arriving at its decision as to count VIII.

On cross-examination, Kate testified that there were some occasions that Auld took her home (alone) at night during the time he lived at the Trinity Street house. Kate testified that Auld took her home from the Trinity Street house at night "less than 10 times." Logically, that, standing alone, could include just zero or one time, but contextually can be rationally understood to mean two to nine times. And about "half the time" he took her home at night, he "messed with her," which the jury contextually could have understood rationally as touching her in at least her genital area. Later, on cross-examination, Kate affirmed that Auld took her home about twice a month for some unstated number of months and that a few of those times were at night. Charles testified that, during a period of about seven or eight months, Auld lived at the Trinity Street address. So, the above evidence could support rational conclusions by the jury that (1) Auld took Kate home fourteen to sixteen times (two times per month of living at the Trinity Street address), (2) "a few of" those times were at night, and (3) about half of those nighttime trips he "messed with her." The jury could conclude from that evidence that Auld touched Kate's genital area at least three times when driving her home from Trinity Street. That provides legally sufficient evidence that Auld touched Kate's genitals at least three times when traveling home from the Trinity house. From that math, this combination of evidence provides legally sufficient evidence of another touching by Auld of Kate's genital area, beyond the two detailed earlier in our analysis, supporting count VIII.

13

As a result, we find that the evidence was sufficient to support the jury's verdicts on counts I through VIII. We, therefore, overrule this point of error.

*(2)*    *Auld Did Not Preserve His Complaints About Admission of Extraneous-Offense Evidence at Guilt/Innocence*

Auld also complains that the trial court erred by admitting extraneous-offense evidence during the State's case-in-chief. Over Auld's objection, the State was allowed to present testimony from Annabelle,[9] who told the jury that, when she was around ten or eleven years old, she, her mother, and her sister lived with Auld and his wife. Annabelle estimated Auld to have been about thirty years old at the time. She testified about an occasion where Auld invited her, but not her older sister who was also home at the time, into his bedroom to play a game. In the bedroom, Auld suggested that they play truth or dare. When Annabelle asked Auld, "Is it true you have a secret, and if so, what?" Auld leaned close to her and told her that he "got caught masturbating in the locker room by a bunch of cheerleaders." Annabelle said Auld "added extra emphasis on the word masturbating." She did not know what that word meant, but "just knew that it wasn't a normal word."

On appeal, Auld argues that this evidence was not admissible because the State did not provide notice of its intent to use extraneous-offense evidence at trial. "On timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce" extraneous-offense evidence in the State's case-in-chief. TEX. R. EVID. 404(b)(2). Auld has directed us to nowhere in the record where he requested pretrial

---

[9]A pseudonym.

14

notice of extraneous offenses.  Thus, the State was not obligated to provide Auld with notice of Annabelle's testimony.  *See Espinoza v. State*, 853 S.W.2d 36, 39 (Tex. Crim. App. 1993).[10]

The State also urged admission of Annabelle's testimony under Rule 405(b).[11]  However, none of the various trial objections made by Auld complained of admission of Annabelle's testimony under that Rule.  Hence, Auld did not preserve this matter for our review.

The State announced its intent to offer Annabelle's testimony under the authority of Rules 404(b)(2) and 405(b).  Auld objected (1) that he was not prepared for Annabelle's testimony, though he "knew of her identity," and (2) that Annabelle was "not accusing [Auld] of any sexual impropriety, therefore, I think it's too prejudicial to bring her in for that purpose."  Auld's counsel told the court that he knew Auld played dare or die with Kate but did not think Annabelle's testimony would be relevant because it would not allege "sexual impropriety."  But nothing in his objections alerted the court that he was challenging admission of Annabelle's testimony under Rule 405(b).  *See Lopez v. State*, 615 S.W.3d 238, 259 (Tex. App.—El Paso 2020, pet. ref'd) (multiple objections, none on the basis or Rule 403, failed to preserve appellate challenge on that specific ground); *Glenn v. State*, 475 S.W.3d 530, 534–35 (Tex. App.—

---

[10]Espinoza, like Auld here, filed a pretrial request for discovery.  And like Auld, Espinoza's motion for discovery made no mention of Rule 404(b) and was not ruled on by the trial court.  *See Espinoza*, 853 S.W.2d at 38–39.  *Espinoza* held that, "when a defendant relies on a motion for discovery to request notice pursuant to Rule 404(b), it is incumbent on him to secure a ruling on his motion in order to trigger the notice requirements of that rule."  *Id.* at 39.  As in *Espinoza*, Auld's "discovery motion did not operate as such a request."  *See id.*

When this matter was being argued, the State told the trial court that it had provided a supplemental witness list to Auld before voir dire, which was conducted nine days before trial.  The State told the court, "We actually hand-delivered that to the defendant's counsel table before we picked the jury."  That supplemental witness list, however, is not in the appellate record.  Further, during the arguments over this matter, Auld told the court that the defense "was aware of" Annabelle's identity but "wasn't prepared for this particular witness."

[11]"When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct."  TEX. R. EVID. 405(b).

15

Texarkana 2015, no pet.) ("'shotgun objections' generally citing many grounds for the objection without argument preserve nothing for appeal"); *Berry v. State*, 813 S.W.2d 636, 639 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd) ("shotgun" objections do not preserve specific error complaints). Because Auld did not tell the trial court that he specifically opposed Annabelle's testimony under Rule 405(b), he did not preserve this argument for our review.

We overrule this point of error.

*(3)     Auld Failed to Preserve His Complaints About Two Witnesses' Testimony*

Two of Auld's points of error present arguments not properly presented to the trial court and thus not preserved for our review. *See* TEX. R. APP. P. 33.1. In his third point of error, Auld claims Upshur County Investigator Linda Roberts was allowed to testify essentially that Auld was guilty, but this does not comport with Auld's objection to the trial court. Auld's fourth point of error argues that Roberts and therapist Robin Boyles were allowed to testify that Kate was truthful in her allegations. Regarding Roberts's testimony, Auld's trial objection does not comport with his appellate point, and he made no objection to Boyles's testimony.

During Roberts's testimony, the State asked her about her investigation and whether she ever interviewed Auld. Roberts said that, by the time she was aware of Kate's allegations, Auld was living in Pennsylvania. Despite multiple requests, Roberts was not able to speak with Auld or get him to return to Texas. The State established that Roberts had interviewed many suspects in her career.

Auld's appeal complains of the following exchange:

[The State]: And those that -- those suspects that are accused of offenses, are they more willing to come and speak to you, in your opinion?

16

[Roberts]:  Depending on what they're being accuse[d] of.

[The State]:  What if they didn't do it?

[Roberts]:  If they didn't do it, they're going to come talk to me.

On appeal, Auld claims that this statement by Roberts—that if a suspect "didn't do it" they would come speak with her—amounted to Roberts giving an (impermissible) opinion that Auld was guilty.[12]

Auld made no objection to this line of questioning or Roberts's answer.  To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context.  TEX. R. APP. P. 33.1(a)(1).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule.  TEX. R. APP. P. 33.1(a)(2).  We overrule this point of error.

The other point of error we cover in this section argues that two state witnesses—investigator Roberts and therapist Boyles—who counseled Kate after the child made known the abuse she endured—were allowed to testify that Kate was truthful in her allegations.

Early in her investigation, Roberts watched the interview that Kate gave to the local Child Advocacy Center (CAC).  Regarding that interview, the State asked Roberts, "But based on what you witnessed as an investigator and what you observed [in the interview], did you formulate an opinion as to whether or not the children appeared to be truthful in the interview?"

---

[12]Here, Auld cites *Boyde v. State*, 513 S.W.2d 588, 590–93 (Tex. Crim. App. 1974), where prosecutorial misconduct—continuously eliciting improper testimony and asking impermissible questions—required reversal. Boyde objected and secured instructions to disregard the various improprieties of the prosecution.  Auld did not.

Roberts answered, "Yes." Auld objected that that answer was "speculation" and that Roberts had "no basis of knowledge of [Kate] before that, and would have nothing to form an opinion as to whether she's truthful or untruthful."

Those objections do not comport to the argument on appeal. *See Rogers v. State*, 402 S.W.3d 410 (Tex. App.—Houston [14th Dist.] 2013), *vacated on other grounds*, 426 S.W.3d 105 (Tex. Crim. App. 2014). Like Auld, Rogers complained on appeal that a witness was allowed to testify to the truthfulness of a witness. *Rogers*, 402 S.W.3d at 417. However, his trial objection was that the proffered testimony would be speculation. *Id.* Because he did not present the appellate objection to the trial court, Rogers failed to preserve his claimed error for review. *Id.*;[13] *see also Broxton v. State*, 909 S.W.2d 912 (Tex. Crim. App. 1995). There, a trial objection based on Rule 403 of the Texas Rules of Evidence did not comport with, and therefore did not preserve, the appellate complaint that the defense was denied an opportunity to present a defense or deprived of its constitutional rights to due process and course of law. *Id.* at 918.

Auld's complaint on appeal, that Roberts was improperly allowed to testify as to Kate's truthfulness, does not comport with his trial objection, that Roberts's answer was only speculative because she had no prior experience with Kate and thus no basis to determine if the child was indeed being truthful.[14]

---

[13]Here, the *Rogers* court cited Rule 33.1(a) of the Texas Rules of Appellate Procedure and *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999).

[14]We also point out that, after Auld's objections were overruled, the only testimony elicited from Roberts was that she had "formulate[d] an opinion based on what [she] observed." Next, Roberts was asked if Kate ever accused any other person as a perpetrator. The answer was that she had not, that Auld was the only subject of Kate's accusations.

18

Similarly, Auld urges a finding of error in the admission of testimony by counselor Boyles to the effect she did not think Kate's testimony had been coached. But because Auld lodged no objection to the testimony, this issue is also not preserved.

The State asked Boyles if, based on her training and experience, she had any suggestion Kate had been coached or manipulated to make her allegation against Auld. Boyles testified that she had not. Auld did not object to that testimony and, thus, did not preserve it for our review.

These contentions of error are overruled.

*(4)* *Admission of Witness Testimony Under the Excited-Utterance Exception to the Rule Against Hearsay Was Harmless Error*

Kate's friend Cassie was allowed to testify to some details that Kate had told her about Auld's abusive acts. To Auld's hearsay objection, the State argued that the testimony was admissible under the excited-utterance exception to the rule prohibiting hearsay. *See* TEX. R. EVID. 803(2). On appeal, Auld claims that Kate's statements to Cassie did not qualify as an excited utterance. We agree but find the error harmless.

Cassie testified that she was Kate's best friend. She described an occasion when Kate disclosed to her something about which Kate was upset. Describing Kate's demeanor at the time, Cassie said Kate "was nervous" and "was tearing up," had a red face and was crying, and seemed to be under stress, because "[s]he was fidgeting with her hair and her fingers a lot." Over Auld's objection, Cassie was allowed to testify that Kate had told her about a time she was staying overnight with Autumn at Auld's house. On that occasion, Kate woke to find her pants unzipped and "could feel -- felt what had happened." Kate told Cassie "that a lot of times when

19

she went to [Autumn's, Auld] . . . would touch her and would make her do the dirty with him." Cassie was not asked to, and did not, elaborate.

We are not convinced that Cassie's reporting Kate's statements met the requirements of an excited utterance as contemplated by Rule 803(2) of the Texas Rules of Evidence. In *Aguilera v. State*, 75 S.W.3d 60 (Tex. App.—San Antonio 2002, pet. ref'd), the court found error where the trial court allowed hearsay testimony from the complainant "made nearly one year after the date of the most recent allegation" of sexual abuse. *Id.* at 68. The record here does not support a finding that, when Kate made her statement to Cassie, Kate "was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement." *See Zuliani v. State*, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003) (quoting *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992)). Stated another way, there is no showing that Kate "was excited or emotionally stimulated or in the grip of a shocking event so as to render the statement a spontaneous utterance." *Mumphrey v. State*, 155 S.W.3d 651, 658 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001)). It was error to admit Cassie's testimony under the excited-utterance exception to the hearsay rule.[15]

---

[15]At trial, the State argued, alternatively, that Cassie's testimony was admissible as Kate's present sense impression. The present-sense-impression exception has "relatively more strict requirements" than the "relatively more liberal requirements of" the excited-utterance exception. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008). "Authors on the subject agree that the excited-utterance exception is broader than the present-sense-impression exception." *Id.* at 240. The record does not support a finding that, when Kate made her statement to Cassie, Kate was "describing or explaining an event or condition made while [Kate] was perceiving the event or condition, or immediately thereafter." *See* TEX. R. EVID. 803(1). Thus, while this Court will uphold a "trial court's ruling if it was correct under any theory of law applicable to the case," we cannot uphold the court's ruling here. *See State v. Zuniga*, 512 S.W.3d 902, 909 (Tex. Crim. App. 2017).

The erroneous admission of hearsay testimony is non-constitutional error and is disregarded unless the defendant's substantial rights were affected. *See* TEX. R. APP. P. 44.2(b); *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). "An error does not affect substantial rights if the appellate court has 'a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect.'" *Macedo*, 629 S.W.3d at 240 (quoting *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018)).

> In making this determination, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error.

*Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018).

First, we conclude that Cassie's testimony would have had significantly less impact on the fact-finder than Kate's. Cassie's hearsay testimony was not very specific or detailed as to elements of the charged offenses. She related Kate's statements that, on one occasion, she woke to find her pants unzipped and that, on several occasions, Auld, alone with her, would take her home and "do the dirty." Kate's trial testimony was more specific about the ride-home occasions. Kate did not testify about waking with unzipped pants,[16] but she more specifically described other instances of Auld touching her under her underwear.

Second and third, if the jury believed Kate's testimony and that of the other witnesses other than Cassie, and it apparently did, the evidence other than Cassie's testimony was ample to support all eight charges. We detailed the evidence above. *See* TEX. CODE CRIM. PROC. ANN.

---

[16]In her statement to a SANE, she did mention waking one time to find her "pants unbuttoned," though they were buttoned when she went to sleep, but did not describe any touching that occurred on that occasion.

21

art. 38.07(b)(1) (Supp.). Viewed in the context of the rest of the evidence, Cassie's hearsay testimony was relatively insignificant. Kate's descriptions of Auld's conduct was substantially more graphic and descriptive. Cassie's testimony about what Kate told her was vague and general in comparison to Kate's testimony.

Fourth, the State did not emphasize Cassie's hearsay testimony in argument. The State mentioned Cassie only once in opening argument, which covers four pages of the reporter's record. Outlining the anticipated evidence, the State told the jury, "You're going to hear who [Kate] first told and you're going to hear from that witness too." During closing argument (spanning twelve pages total, between closing and rebuttal closing) the State's only reference to Cassie's testimony came in rebuttal: "[I]t takes a lot to tell your friend that you're being hurt and harmed by someone in a position of trust with you."

In light of the above factors and other evidence, including but not limited to testimony about Kate's psychological state in the years following Auld's abuse and inappropriate comments he made to another young girl before, mentioned above, we believe the inadmissible hearsay did not "influence the jury, or had but a slight effect." *Macedo*, 629 S.W.3d at 240 (quoting *Gonzalez*, 544 S.W.3d at 373). We conclude that the erroneous admission of Cassie's hearsay testimony was harmless. We overrule this point of error.

*(5)     Auld Has Not Established Ineffective Assistance of Counsel*

Auld also points to trial counsel's failure to object to the testimony of Roberts and Boyles, discussed above, and claims such failures amount to ineffective assistance of counsel. We overrule this point of error, as the claim has not been established.

22

To prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). *See Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009) (orig. proceeding). A failure to make a showing under either prong defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003). "As many cases have noted, the right to counsel does not mean the right to errorless counsel." *Lampkin v. State*, 470 S.W.3d 876, 896 (Tex. App.—Texarkana 2015, pet. ref'd) (citing *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)).

The first prong requires a showing "that counsel's performance fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. This requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "Trial counsel 'should ordinarily be afforded an opportunity to explain his [or her] actions before being'" found ineffective. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012).

When an appellate record is silent on why trial counsel failed to take certain actions, the appellant has "failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable." *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); *see Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). This is because allegations of ineffectiveness "must 'be firmly founded in the record.'" *Bone v. State*, 77 S.W.3d 828, 833 n.13 (Tex. Crim. App. 2002) (quoting *Thompson*, 9 S.W.3d at 813). When a party claims, for the first time on direct appeal, that trial counsel was ineffective, the defendant must show that "under

23

prevailing professional norms," *Strickland*, 466 U.S. at 688, no competent attorney would do what trial counsel did or no competent attorney would fail to do what trial counsel failed to do, *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). "The second *Strickland* prong, sometimes referred to as 'the prejudice prong,' requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). Consequently, to establish prejudice,

> an applicant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." [*Strickland*, 466 U.S.] at 687 . . . . It is not sufficient for Applicant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693 . . . . Rather, [he] must show that "there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt." *Id.* at 695 . . . .
> The applicant has the burden to prove by a preponderance of the evidence the ineffective assistance of counsel. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Allegations of ineffectiveness must be based on the record, and the presumption of a sound trial strategy cannot be overcome absent evidence in the record of the attorney's reasons for his conduct. *Busby v. State*, 990 S.W.2d 263, 269 (Tex. Crim. App. 1999). The reviewing court must look to the totality of the representation, and its decision must be based on the facts of the particular case, viewed at the time of counsel's conduct so as to eliminate hindsight bias. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. In all cases, the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding." *Id.* at 696, 104 S.Ct. 2052.

*Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

Auld has failed to rebut the presumption that his trial counsel's decisions were "in some way—be it conceivable or not—reasonable." *Mata*, 226 S.W.3d at 431. As regards Roberts's statement that, "[i]f they didn't do it, they're going to come talk to me," Auld's only authority

24

that this statement was objectionable is to *Boyde.* There, the instances of prosecutorial misconduct were legion. In contrast, Auld complains of only this statement by Roberts.

Boyles's statement, that she saw no indication that Kate's statements and allegations had been coached, may well have been objectionable,[17] but this does not prove trial counsel's performance was deficient. *See Tapia v. State*, 933 S.W.2d 631, 634 (Tex. App.—Dallas 1996, pet. ref'd) (failure to object to hearsay testimony, with a record silent as to counsel's reasons and decisions, did not establish deficient performance).

Even assuming without deciding that Auld could satisfy the deficient-performance prong of *Strickland*, he has made no showing of a "reasonable probability that, absent the [purported] errors, the fact[-]finder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. We overrule this point of error.

*(6)     Conclusion*

Each of the trial court's judgments inaccurately describes the felony of conviction as a first-degree felony, whereas indecency with a child by contact is a second-degree felony. *See* TEX. PENAL CODE ANN. § 21.11(d). It is true that, because a prior felony conviction was proven, Auld's penalty was enhanced to the penalty range for a first-degree felony. *See* TEX. PENAL CODE ANN. § 12.42(b). "[S]tatutes enhancing punishment ranges for the primary offense do 'not increase the severity level or grade of the primary offense.'" *Bledsoe v. State*, 480 S.W.3d 638, 642 n.11 (Tex. App.—Texarkana 2015, pet. ref'd) (quoting *Ford v. State*, 334 S.W.3d 230, 234 (Tex. Crim. App. 2011)).

---

[17]*See Yount v. State*, 872 S.W.2d 706, 710–11 (Tex. Crim. App. 1993).

25

"This Court has the power to correct and modify the judgment of the trial court for accuracy when the necessary data and information are part of the record." *Anthony v. State*, 531 S.W.3d 739, 743 (Tex. App.—Texarkana 2016, no pet.) (citing TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)). "The authority of an appellate court to reform incorrect judgments is not dependent on the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court." *Id.* (quoting *Asberry*, 813 S.W.2d at 529–30).

We modify the judgments as to all counts to reflect that Auld was convicted of second-degree felonies in each count. As modified, the trial court's judgments and sentences are affirmed.


Josh R. Morriss, III
Chief Justice

Date Submitted:     April 13, 2022
Date Decided:       July 21, 2022

Publish